**In the Matter of CONTINENTAL AIRLINES, INC., et al., Debtors.**

**Bankruptcy Nos. 90–932 thru 90–984. Motion No. 91–245.**

United States Bankruptcy Court, D. Delaware.

Dec. 6, 1991.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

### I. *Introduction*

Continental Airlines, Inc. is in default on an obligation due First City, Texas–Houston, N.A., Trustee, and Roark Ashie, Mortgage Trustee (collectively First City) in connection with a bond issue for the construction of a Flight Kitchen at Houston Intercontinental Airport on land leased from the City of Houston. First City seeks relief from stay to exercise their right to foreclose on the collateral securing the loan or receive adequate protection payments.

For the reasons that follow, First City will be granted partial relief from stay to proceed against a portion of their collateral.

### II. *Background*

In June of 1989, Harris County Industrial Development Corporation (HCIDC) issued Airport Facilities Revenue Bonds, the proceeds of which were loaned to Continental for construction of a new 139,150 square foot Flight Kitchen at Houston Intercontinental Airport (HIA). Under the terms of the Loan Agreement, Continental executed a promissory note in favor of HCIDC, who has endorsed the Note to First City, Trustee under the Bond Indenture Agreement. Continental collateralized the loan with its leasehold interest in the Flight Kitchen and the cash accounts set up per the Bond Indenture Agreement. (Together, these documents constitute the Transaction Documents.)

After Continental paid issuance costs, the Bond proceeds were deposited into two accounts: the Construction Fund ($16,992,-920) and the Debt Service Reserve Fund (Reserve Fund) ($1,931,000). The Construction Fund contained approximately $3,423,931 as of the petition date, after payment of all but two invoices. Under the Transaction Documents, Continental is to make its scheduled interest payments to the Debt Service Fund. A default entitles the Trustee to apply the funds on deposit in

Richard G. Elliott, Jr., Allen M. Terrell, Jr., Todd V. Jones, Wilmington, Del., Jarrel D. McDaniel, John E. West, Houston, Tex., for First City, Texas, Houston, N.A., Trustee and Roark Ashie, Mortgage Trustee.

William H. Sudell, Jr., Wilmington, Del., for debtors.

Bennett Murphy, New York City, for Unsecured Creditors Committee.

the Construction Fund or Reserve Fund to Continental's indebtedness. The balance in the Construction Fund after completion of the Flight Kitchen is to be transferred to the Debt Service Fund to pay down outstanding principal. If and when Continental satisfies its total obligations under the Loan Agreement, it is entitled to all monies remaining in the various Funds. Trust Indenture, Section 307 (p. III–4).

Continental occupies the Flight Kitchen site through its subsidiary Chelsea Catering Corporation pursuant to a 23–year ground lease from the City of Houston. The rent is very low ($13,585/month now gradually increasing to $28,172/month by 2009) as it is based on the unimproved land rate, with a 7–year renewal option at market rate. Title to the improvement has vested in the lessor. The Flight Kitchen may only be utilized "to provide in-flight food catering to aircraft owned and operated by [Continental]." Lease Agreement, section 6.05(c).

Continental filed its bankruptcy petition on December 3, 1990, the date its first payment was due under the Transaction Documents. The total indebtedness as of that date was $19,600,000 in principal and $946,516 in interest. It has not made any of its scheduled debt service payments of approximately $155,000/month.

### III. *The Evidence*

First City's motion requires valuation of its collateral. While the value of the Construction and Debt Reserve Funds is clear, the value of Continental's leasehold interest in the Flight Kitchen is anything but.

■ The parties agree the value of the leasehold is the difference between the fair market rent for the Flight Kitchen and the below market rent payable under the Lease Agreement, discounted to present value. The rent payable under the Lease Agreement is known—the market rent for the Flight Kitchen must be determined. The three methods commonly used to determine market value are replacement cost, sales comparisons, and income stream analysis. The most reliable method, comparable sales, is not available here. There have

been no sales or rentals of even remotely comparable leasehold interests in the Houston area.

As of the petition date, the First City appraiser valued the Leasehold equity at sixteen million dollars. Continental's appraiser placed the value at seven and one-half million dollars. Since as of the petition date First City was owed $20,546,516 less the cash collateral in the Debt Reserve and Construction Funds, First City needs a valuation of at least $15,191,585 on the leasehold interest to be fully secured.

### A. First City's Valuation

David M. Lewis, CRE, MAI, SRPA, of Lewis Realty Advisors, testified for First City on the market value of Continental's leasehold interest in the Flight Kitchen. Mr. Lewis relied on two methods to determine a fair market rent. For the first, he calculated what rent would be required to fully compensate a developer for the total costs associated with the development of this Flight Kitchen. In the second method, the appraiser correlated annualized fees paid by other national hub flight kitchens with the number of departing passengers (enplanements) from that airport to determine what this Flight Kitchen could afford to pay in fees or rent.

#### 1. *Cost Approach*

■ The cost approach involves determining total development costs less any depreciation (such as physical deterioration, functional obsolescence, and external obsolescence), and then calculating what market rent would be necessary to fully compensate a developer for those costs.

Mr. Lewis started from the actual construction cost of the facility, completed in 1990 for $14,045,123. The depreciation was estimated at zero because the kitchen was only months old and all equipment was still under warranty. Mr. Lewis added a 15% entrepreneurial profit, the return an investor would expect on a project of this size (but not a flight kitchen). He next calculated the market value of the fee simple interest in the land at $3,575,000 by capitalizing

the market rent applicable to the long-term ground lease. The total came to $19,725,-000. After capitalizing through the lease term and discounting back to present dollars, a monthly "market rental" (including a 7% compounded increase per year) can be calculated which would fully amortize the cost of the Flight Kitchen. This market rent is $128,133 for the period December 1991 through December 1992. Lewis Appraisal p. 101.

Continental's appraiser took issue with this analysis on several grounds. First, an entrepreneurial profit is not appropriate for a flight kitchen. Second, the land value should not be included because the land lease is at market rate. Third, depreciation is significant due to external obsolescence such as a lack of demand for the Flight Kitchen.

The court agrees that entrepreneurial profit is not appropriate for a flight kitchen. Airlines build these facilities to save operating costs, not to make a profit on the construction. The savings Continental realizes from operating its own flight kitchen is not analogous to the profit a developer would reap on the construction of a like sized project for resale.

The court also finds the ground lease should not have been added to the replacement cost, as the more convincing evidence is that it is at market value. Finally, the flight kitchen could well be commercially obsolete, the functional equivalent of depreciation. The kitchen is one of the largest (if not the largest) in the country at a time of significant airline downsizing. Another flight kitchen at Intercontinental was closed when this one opened. Although significantly smaller, it could be operational with new equipment.

Subtracting those three factors, Continental's appraiser valued the Flight Kitchen leasehold Estate at $7,500,000 after adopting several market assumptions which will be discussed below. While the court has its doubts that this is a logical methodology to evaluate a leasehold estate (*see In re Executive House Assocs.*, 99 B.R. 266, 278 (Bankr.E.D.Pa.1989) ("The replacement cost approach was viewed by both appraisers as irrelevant to the concerns of a hypothetical prospective buyer."), if it is a valid approach, Continental's estimated value seems more accurate.

### 2. *The Stream of Income Approach*

The second method used to estimate a fair market rent for the subject was to determine what the Flight Kitchen could afford to pay in rent. Mr. Lewis collected data from other national hub airports on the fees and rents paid by flight kitchens at those airports. He plotted revenue against number of enplanements at those airports and performed a least squares regression analysis on the points. From the resulting equation, a calculated market rent can be determined since the number of enplanements at HIA (normalized by Continental's market share) is known.

Continental attacked this correlation on various grounds. The revenues taken in at the various airports were unrelated: some were taxes, others were rents, still others were flat fees. The coefficient of fit was so low as to render the proposed equation meaningless. Finally, the least squares regression analysis performed on the data was invalid because the two outlying points were discarded. The court agrees there is no relationship between enplanements and flight kitchen revenues. There are simply too many variables in the revenue data to yield a meaningful predictive equation.

### B. Continental's Valuation

After having attacked First City's appraisal, Continental was bound to tender its own. Mr. Anthony Wells, ASA, of American Appraisal Associates, started from the same premise—that he would need to estimate the fair market rent over the term of the lease, subtract the ground lease rent and discount to present value to value the leasehold.

Mr. Wells ultimately came up with a leasehold market value of $7,500,000 as of December 3, 1990, less than half the figure Mr. Lewis arrived at, in part due to a slightly different methodology and in part the result of less optimistic market predictions. While Mr. Lewis saw a Texas econo-

my on the road to recovery and a successful reorganization for Continental, Mr. Wells predicted that the market would take a conservative view of Continental's likelihood of a successful reorganization.

The appraisal began with a description of the three main factors to be considered in estimating the leasehold interest: replacement cost; competitive position in the market ("supply and demand"); and probable reluctance to pay full replacement cost of the flight kitchen. The replacement cost has already been discussed in III.A.1.

The supply and demand analysis was broken into three possible scenarios (taken from a recent Houston airport bond prospectus): Continental emerges from a bankruptcy successfully reorganized; Continental ceases operations and its hub activity is immediately replaced by other airlines; or, Continental ceases operations and its hub activity is slowly replaced by other airlines. Obviously, demand for a large flight kitchen at Intercontinental will vary widely depending on what the future holds, or rather what the market thinks the future holds.

On the supply side, there are two fully operational flight kitchens at Intercontinental, and a third which could be reopened. The operating kitchens, Dobbs (40,000 square feet) and Caterair (30,000 square feet), are not operating at full capacity, but they are not large enough to replace Chelsea's services if the Chelsea Flight Kitchen were closed and demand remained constant. In any but scenario 1, the Lease Agreement with the City would have to be modified to allow the Flight Kitchen to serve airlines other than Continental or its subsidiaries. The City of Houston has enforced Section 6.05(c) of the Lease against Continental to prevent Chelsea from providing food services to Lufthansa and other airlines.

Based on the three scenarios, Mr. Wells placed the market value of Continental's leasehold interest in the Chelsea Flight Kitchen in the range of $5,600,000 to $14,-000,000. "The difficulty in valuing a property such as the subject is that it is unique and would be traded in a very limited market." Wells appraisal at 77. To determine a precise value in the face of an uncertain market involves selecting the market the market itself would predict. Mr. Wells believes the marketplace would predict scenario 2 as the most likely, and accordingly picks the high end of the scenario 2 range ($6,300,000 to $7,700,000), $7,500,000 as the price the market would pay to step into Continental's shoes in the Lease Agreement.

The court accepts Mr. Wells' appraisal value, but without endorsing the predictions of Continental's ability to successfully reorganize and retain hub status at Intercontinental Airport. The court has no comment on which of the three scenarios is more likely, it only recognizes the reality of a conservative market approach. Although the Chelsea Flight Kitchen is state of the art and in excellent condition, if it were to be placed on the market for lease, it is unlikely a developer could recoup its costs. A 139,150 square foot flight kitchen could well be a white elephant at Houston's Intercontinental Airport.

C. Depreciation

After determination of the leasehold value as of the petition date, the next relevant dates are September 3, 1991, the date movants filed their stay motion and further dates to determine depreciation, if any. Continental has submitted valuations for the petition date, September 3, 1991 ($7,400,000) and October 3, 1991 ($7,435,-000). On cross-examination, Mr. Lewis agreed he did not determine a leasehold value as of any date in October 1991. However, he did revalue the leasehold interest at $14,000,000 as of October 15, 1991. This $2,000,000 depreciation is simply the lost "market rent" payments First City alleges are its due. First City also presented a straight-line depreciation schedule for the Flight Kitchen at the hearing.

The court does not agree that the leasehold estate decreased in value simply to the extent "market rent" has not been paid or bond obligations met. First City's eleventh hour straight-line depreciation evidence is

similarly abstract. *See Mack Fin. Corp. v. Elco Logging Corp. (In re Elco Logging Corp.)*, 42 B.R. 9, 11–12 (Bankr.D.Or.1983) ("This Court believes that values reached through use of depreciation methods allowed by the Internal Revenue Code to save taxes are little aid in determining valuation for purposes of adequate protection.").

As both appraisers agree, a purchaser of Continental's leasehold interest is buying a stream of savings equal to the difference between market rent and contract rent under the Lease Agreement. The leasehold is increasing or decreasing in value over time by the difference of the present value of the savings which will be received in the future. This is what Mr. Wells calculated, and the court accepts his figure of $5,000 per month depreciation.

Continental also presented evidence that the Construction and Reserve Funds were appreciating at a rate of $20,000 per month due to accrued interest.

## IV. *Legal Analysis*

### A. The Fund Monies

First City seeks access to the Debt Reserve and Construction Funds on two theories. The first is that the funds are held in an express or constructive trust for the benefit of the bondholders, therefore the monies never became property of the estate. *Begier v. Internal Revenue Service*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). Under this theory, First City is entitled to foreclose on the funds regardless of the automatic stay. In the alternative, if the funds are property of the estate, First City is entitled to relief from the stay under 11 U.S.C. § 362(d)(2): Debtor concedes it has no equity in the Funds and First City contends the monies are not necessary to an effective reorganization. Continental replies that the Funds *are* property of the estate; the Trust terminology is an idiosyncracy of Texas construction law not meant to benefit bondholders. 10 Tex. Prop.Code §§ 162.003, 162.004 (1991). Additionally, even though it has no equity in the funds, cash is always necessary in a reorganization. The court finds that the funds are indeed property of the estate but that Debtor has failed to show the property is necessary to an effective reorganization. 11 U.S.C. § 362(g)(2).

### 1. *Property of the Estate*

Under section 541(a)(1) "all legal or equitable interests of the debtor in property as of the commencement of the case" become property of the estate. The section is interpreted broadly. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–205, 103 S.Ct. 2309, 2313–2314, 76 L.Ed.2d 515 (1983); *Cuffee v. Atlantic Business and Community Development Corp. (In re Atlantic Business and Community Corp.)*, 901 F.2d 325, 327 (3d Cir.1990). It extends to property "wherever located and by whomever held" (11 U.S.C. § 541(a)), and includes the Debtor's legal, equitable and possessory interests. *Mays v. United States (In re Mays)*, 85 B.R. 955, 960 (Bankr.E.D.Pa 1988) (citations omitted).

The property is included unless it meets one of the narrow statutory exceptions of sections 541(b), (c)(2) or (d). The only exception arguably applicable is 541(d):

(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

"To the extent that such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate...." *In re Southwest Citizens Org. for Poverty Elim.*, 91 B.R. 278, 281 (Bankr. D.N.J.1988) (citing 124 Cong.Rec. # H11096 (daily ed. Sept. 28, 1978) (remarks of Congressman Edwards)).

Section 541(d) was enacted to protect the secondary mortgage market (*In re Cambridge Mortg. Corp.*, 92 B.R. 145, 150

(Bankr.D.S.C.1988) (citing legislative history)) but has been read expansively to include express and constructive trusts as well. *See In re First Capital Mortg. Corp.*, 872 F.2d 335 (10th Cir.1989) (rehearing granted) (escrow funds held in trust for another not property of the estate); *United States v. Daniel, (In re R & T Roofing Structures & Commercial Framing Inc.)*, 887 F.2d 981, 987 (9th Cir.1989) (funds set aside for IRS may be statutory trust).

■ The court need not reach the question of whether an express or constructive trust exists under Texas state law because the debtor holds more than bare legal title to the funds; it has an equitable interest as well. The Funds were set up to guarantee repayment and it remains to be seen whether the Bondholders will be paid in full. The Funds are not analogous to escrow accounts, in which monies are set aside for a closing and are never to return to the buyer. Continental is entitled to the entire fund when and if it satisfies its obligations under the Transaction Documents.

On almost identical facts, Judge Scholl has held that a debtor's interest in a bond proceeds reserve fund was property of the estate even though subject to an express trust. *United Jersey Bank v. CS Assocs. (In re CS Assocs.)*, 121 B.R. 942, 960 (Bankr.E.D.Pa.1990) (citing *Begier*, 110 S.Ct. at 2263). As such, the funds were subject to a relief from stay analysis. *See also Soliman v. Spencer (In the Matter of Spencer)*, 115 B.R. 471, 476 (D.Del.1990) (holding that § 362(d)(1) "cause" may exist to lift stay if debtor's interest in property is purely legal).

### 2. *Relief from Stay*

The automatic stay exists to give the debtor a breathing spell, gather its thoughts, and begin the process of liquidation or reorganization. *Bankruptcy Reform Act of 1978*, S.Rep. No. 989, 95th Cong., 2d Sess. 54, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5840. It is not intended to continue indefinitely. *Wedgewood Inv. Fund, Ltd. v. Wedgewood Realty Group, Ltd. (In re Wedgewood)*, 878 F.2d 693, 697 (3d Cir.1989).

Section 362(d) provides the secured creditor with two grounds for relief from the automatic stay:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

To obtain relief, movant must make out a *prima facie* case that the obligation exists, the security interest is valid, and there is "cause" such as a post-confirmation default or a lack of equity in the property. *See, e.g., In re Cabrillo*, 101 B.R. 443, 447 (Bankr.E.D.Pa.1989); *In re Ocasio*, 97 B.R. 825, 826 (Bankr.E.D.Pa.1989). Once movant has satisfied its burden, the burden shifts to the debtor to show either that the creditor is adequately protected or that the property is necessary to an effective reorganization. 11 U.S.C. § 362(g).

■ First City seeks relief under section 362(d)(2). Debtor concedes that it has no equity in the Funds, therefore the first prong is satisfied. Debtor must show the Funds are "necessary to an effective reorganization" to maintain the automatic stay. At the hearing, Continental presented no evidence that the Funds were necessary to an effective reorganization. In its post-summations memorandum, Continental argues that because the Funds collect interest which will pay down the Note principal, the stay benefits the estate. Also, Continental apparently would like the use of the cash collateral in its reorganization plan, but that would have to be the subject of a different sort of hearing.

This raises a separate issue: to whom does the interest accruing on the Funds

belong; and towards what does it count? First City contends that as a secured creditor it is entitled to the interest which should be applied to post-petition interest accruing on the Note. *Sexton v. Dreyfus*, 219 U.S. 339, 346, 31 S.Ct. 256, 258, 55 L.Ed. 244 (1911). As Continental points out, *United Sav. Ass'n v. Timbers of Inwood Forest Assocs. (In re Timbers)* is curiously absent from movants discussion of this topic. 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). As an undersecured creditor, First City is not entitled to post-petition interest due to delays attributable to the automatic stay. *Id.* at 373, 108 S.Ct. at 631. It is, of course, entitled to the interest payments due under the Indenture Agreement. If Continental defaults on its bond obligations, the interest, as cash proceeds collateral, will be applied towards the debt. 11 U.S.C. § 552(b); U.C.C. § 9–306.

Since Continental has not met its burden under section 362(g)(2), the court will grant relief from stay as to both the Construction Fund and the Debt Reserve Fund. First City is entitled to its cash collateral in accordance with the terms of the Transaction Documents.

### B. The Chelsea Flight Kitchen

#### 1. *The Automatic Stay*

■ As with the Funds, Debtor has stipulated to its lack of equity in the Flight Kitchen but argues that the Kitchen is necessary to an effective reorganization. Debtor offered the testimony of its Vice-President that the Flight Kitchen saves the airline approximately six million dollars a year in operating costs. Since under all contemplated reorganizations Continental would keep its hub at Houston's Intercontinental Airport, the Flight Kitchen is an important part of any reorganization plan. The court is persuaded that Continental has met its burden of proof on this issue. This is not the time for Continental to spend time and money negotiating for outside flight kitchen services, if indeed there were sufficient alternate capacity at Intercontinental now.

Additionally, the collateral must be necessary to a reorganization in prospect.

*Timbers*, 484 U.S. at 376, 108 S.Ct. at 632–33. Normally, this involves an analysis of the debtor's plan for likelihood of success. *In re Executive House Assocs.*, 99 B.R. 266, 279–280 (Bankr.E.D.Pa.1989). Without a plan on file, the court must examine the likelihood of the timely filing of a feasible plan leading to an effective reorganization. Continental submits that it is diligently pursuing reorganization alternatives, and it would be premature to find that it cannot effectively reorganize. Many previously disputed matters have settled recently or are very close to settling. There have been several extensions to the exclusivity period, but Continental is a large corporation; the formulation of a plan is an especially complex matter in such a case. *In re Ledgemere Land Corp.*, 125 B.R. 58, 64–65 (Bankr. D.N.H.1991). Another large corporate debtor, Circle K, was recently granted its fourth exclusivity extension. 22 BCD Issue 9, p. A6.

■ Nor is First City entitled to relief from stay for cause under Section 362(d)(1). The court has found that the Flight Kitchen leasehold is declining in value by approximately $5,000 per month. This is not a large enough decline in value to justify relief from stay on the ground that the creditor is not adequately protected.

#### 2. *Adequate Protection Payments*

Movants seek adequate protection payments equal to the lost market rent as valued by Mr. Lewis, or at least the market rent as valued by Mr. Wells. While intuitively it seems obvious that the leasehold estate value is diminishing with the passage of time (lost rents), that is not necessarily so. First City argues that to the extent it does not receive rental payments, that income is irretrievably lost; it may never be recaptured. Therefore, its collateral is decreasing in value. But that is a *non sequitur*. Continental correctly points out that First City is not entitled to the benefit Continental receives under the lease, First City is only entitled to payments to the extent it is harmed by Continental's continued occupation of the lease-

hold estate. *In re Flagler–At–First Assoc., Ltd,* 114 B.R. 297, 301 (Bankr.S.D.Fla. 1990).

 The general rule is that a secured creditor is only entitled to adequate protection payments from the date it so requests. *In re Kain,* 86 B.R. 506, 512 (Bankr. W.D.Mich.1988); *In re Wilson,* 70 B.R. 46, 48 (Bankr.N.D.Ind.1986). An undersecured creditor is only entitled to adequate protection payments if its collateral is declining in value. *In re Timbers,* 484 U.S. at 370, 108 S.Ct. at 629–30. After a default, the Debtor has the burden of proving the secured creditor is adequately protected. 11 U.S.C. § 362(g)(2); *Grimes v. Munoz (In re Munoz),* 83 B.R. 334, 337 (Bankr.E.D.Pa.1988).

At the hearing Continental presented evidence that the leasehold value was declining at a rate of approximately $5,000 per month. At the same time, the Funds are earning interest of approximately $20,000 per month. This increase in the Funds more than compensates First City for any decrease in the value of the leasehold. *In re Vanas,* 50 B.R. 988, 999–1000 (Bankr.E.D.Mich.1985) (offsetting depreciation of equipment with increase in livestock and milk production).

Overall the collateral is increasing in value due to the interest earned on the Funds. However, because the stay will be lifted as to the Funds, it is possible that at some point of Fund depletion First City may be inadequately protected. It is up to First City to seek relief if the interest earned on the Funds falls below $5,000 per month.

## V. *Conclusion*

An order in accordance with this Memorandum Opinion is attached.

### ORDER

AND NOW, December 6, 1991, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT relief is GRANTED as to the Debt Reserve and Construction Funds. First City is entitled to use the funds to cover any amounts past due and future missed payments.

Relief is DENIED as to the Chelsea Flight Kitchen. First City may not foreclose nor is it entitled to adequate protection payments at this point.