**In re PHELPS TECHNOLOGIES, INC. and Phelps Tool And Die Houston, Inc., Debtors.**

**The Official Committee Of Unsecured Creditors, Plaintiff,**

v.

**Sharp Electronics Corporation, A New York Corporation, Defendant.**

**Sharp Electronics Corporation, Third–Party Plaintiff,**

v.

**Monorail, Inc. and Michael D. Phelps, Individually, Third–Party Defendants.**

**Bankruptcy Nos. 98–40371–1–11, 98–40372–2–11.**

**Adversary No. 99–4277–1.**

United States Bankruptcy Court, W.D. Missouri, Western Division.

March 2, 2000.

Michael H. Berman, Overland Park, KS, James A. Chatz, Lincolnwood, IL, for Plaintiff.

Gary D. Barnes, David C. Christian, II, Kansas City, MO, Lynn Ciolino Boyajian, Florham Park, NJ, Deborah L. Mahoney, Wichita KS, A. Dennis Terrell, New Vernon, NJ, for Defendant.

## MEMORANDUM OPINION AND ORDER

JERRY VENTERS, Bankruptcy Judge.

This matter comes before the Court at this time on the competing and contested Motions for Summary Judgment filed by The Official Committee of Unsecured Creditors ("Committee"), the Plaintiff in this Adversary Proceeding, and Sharp Electronics Corporation ("Sharp"), the Defendant herein.

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 547 because it arises in and is related to a case under the Bankruptcy Code (11 U.S.C. § 101, *et seq.*)("Bankruptcy Code"). This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E), (F) and (*O*). This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law under Rule 7052, Fed. R. Bankr.P.

## FACTUAL BACKGROUND

The Committee filed a Complaint on September 15, 1999, seeking to avoid and recover $700,000.00 in allegedly preferential payments received by Sharp within 90 days of the filing of a voluntary Chapter 11 bankruptcy petition by Phelps Technologies, Inc., ("Debtor" or "Phelps") on February 2, 1998.[1] The Committee alleged

---

1. Phelps Technologies, Inc., and Phelps Tool and Die Houston, Inc., related companies,

that Sharp received the $700,000.00 by way of seven wire transfers from Monorail, Inc., ("Monorail"), that the payments were made to Sharp by Monorail on behalf of the Debtor, and that the payments were applied by Sharp to reduce an antecedent debt owed by the Debtor to Sharp, all in violation of 11 U.S.C. § 547. In its Answer, Sharp specifically denied most of the allegations in the Complaint and raised several affirmative defenses.[2] On January 5, 2000, Sharp filed a Motion for Summary Judgment and Suggestions in Support. On January 13, 2000, the Committee filed a Response to Sharp's Motion, opposing the granting of relief requested, combined with its own Motion for Summary Judgment. Sharp filed a Reply to the Committee's Motion on February 4, 2000, and the Court heard oral arguments on both Motions on February 7, 2000.

The undisputed relevant facts, as set out in the pleadings, the affidavits attached to the Motions, and the statements of counsel, are as follows:

According to an August 1997 financial status report attached to Sharp's Motion, the Debtor was a company engaged in manufacturing precision parts and assemblies for computers as well as various other products. Monorail was a new, start-up company that produced personal computers for the retail market. Sharp sold computer screens to the Debtor which apparently put them together with other components necessary to the production of the Monorail computers. According to this financial report, the demand for Monorail's computers was drastically lower than its expectations, causing the Debtor to become over-invested in Monorail inventory and to incur significant operating losses. As a result, the Debtor was unable to pay its suppliers within terms.

In early 1997, the Debtor owed Sharp $1,020,420.00 on open account for screens it had purchased from Sharp. In order to induce Sharp to continue supplying necessary computer components to the Debtor, on March 6, 1997, Monorail provided to Sharp an Unconditional Guaranty ("Guaranty") with a limit of $1,000,000.00.[3] The Guaranty guaranteed Sharp that Monorail would pay up to $1,000,000.00 of the Debtor's debt to Sharp if the Debtor failed to pay its indebtedness or liabilities. The Guaranty contained the following provision:

> "Should Customer [Phelps] for any reason fail to pay such indebtedness or liability when due, Guarantors [Monorail] promise to pay the same upon demand to Sharp at its offices in Mahwah, New Jersey."

On October 9, 1997, some seven months later, the Debtor and Monorail entered into an agreement entitled Phelps/Monorail Agreement ("Phelps/Monorail Agreement") governing the purchase of essential components of Monorail's product that were being assembled by the Debtor. The Phelps/Monorail Agreement contained three provisions that are critical to the issues before the Court. It provided:

> Phelps Technologies, Inc. and Monorail, Inc. believe it is in their mutual best interests to enter into the following business agreement:
>
> 1. Monorail will purchase the components [from Phelps] at a purchase

both filed voluntary Chapter 11 petitions on February 2, 1998. An Order confirming a Joint Plan of Reorganization was entered by the Court on January 11, 1999. However, the issues in this case only relate to Phelps Technologies, Inc., and therefore all references to "Debtor" or "Phelps" will mean only Phelps Technologies, Inc.

**2.** Sharp subsequently filed a Third–Party Complaint against Monorail and Michael D. Phelps based on certain guaranties which they had executed in favor of Sharp. The Third–Party action is presently being held in abeyance pending this Court's ruling on the instant Motions for Summary Judgment.

**3.** Although not at issue here, guaranties were also given to Sharp by Phelps Tool and Die Houston, Inc., and by Michael D. Phelps, president of both Debtors. The guaranties of all three guarantors were joint and several.

price equal to Phelps's actual costs (the "Purchase Price") which are currently in Phelps's Inventory and which were purchased by Phelps specifically for the manufacture of the Monorail personal computer (the "Component Inventory"). The Component Inventory shall be new or factory-reconditioned parts and must pass Monorail's quality inspection. Monorail will not accept defective electrical or electro-mechanical parts. Monorail and Phelps will agree as to the specific items in the Component Inventory, and these items will be verified by a physical count to be completed next week by representatives of Monorail and Phelps. Monorail believes the total Purchase Price of the Component Inventory is approximately $2,200,-000, but is willing to accept a different dollar amount if the physical count verifies a different dollar amount.

2. Monorail will purchase [from Phelps] specific equipment which was used to manufacture Monorail personal computers as long as such equipment can no longer be used by Phelps in any other application. Monorail will purchase up to $250,-000 of such equipment based on depreciated cost using generally accepted accounting principles. Monorail will buy this equipment in five equal installments during the final five weeks of this agreement.

\* \* \* \* \* \*

5. Of the weekly payment due to Phelps by Monorail, $100,000 will be paid directly by Monorail to Sharp Electronics Corp., provided, however, that Monorail will provide commercially reasonable proof of such payment along with an acknowledgment from Sharp that such payments are being directly applied to Phelps's payable to Sharp.

There is no argument that, pursuant to the terms of the Phelps/Monorail Agreement, Sharp received seven wire transfers of $100,000.00 each, for a total of $700,000.00. All of these payments were received between November 20, 1997, and January 9, 1998, within 90 days of the bankruptcy filing by Phelps. There also is no argument that the funds for those payments came from Monorail and did not pass through any bank account of the Debtor; in other words, the payments were made directly to Sharp by Monorail, by way of wire transfers. Further, there is no argument that the $700,000.00 in payments were credited against the unsecured open account balance owed to Sharp by the Debtor.

Additional facts will be developed as necessary in the Discussion section.

## DISCUSSION

### A. The standard for summary judgment

Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, is made applicable to adversary proceedings in bankruptcy by virtue of Bankruptcy Rule 7056. Rule 56 provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

As the parties have pointed out, summary judgment is, on the one hand, a "harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy," *Landmark Bank of St. Charles County v. Saettele,* 784 F.Supp. 1434, 1436 (E.D.Mo.1992), and, on the other hand, is "not...a disfavored procedural shortcut, but rather [is]...an inte-

gral part of the Federal Rules as a whole..." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In summary judgment situations, the burden is on the moving party. But, after the moving party has met its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538(1986). The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).[4]

In this particular case, Sharp, as the defending party, would be entitled to summary judgment if it could demonstrate that there is a lack of adequate factual support for an essential element of the Committee's case, inasmuch as the Committee, as plaintiff, has the burden of proving all of the elements of its case. *Celotex Corp. v. Catrett,* 477 U.S. at 324–26, 106 S.Ct. at 2553–54. If the plaintiff cannot support a required element of its case, then trial is unnecessary and summary judgment may be granted for the opposing party. *Phillips v. Marist Soc'y of Washington Province,* 80 F.3d 274, 277–78 (8th Cir.1996).

Having examined the pleadings and the documents submitted by the parties, the Court is of the opinion that no genuine issue of material fact exists in this case, and therefore it would be proper to enter summary judgment as set out below.

## B. Defendant Sharp's Motion for Summary Judgment

Sharp bases its Motion for Summary Judgment on two theories. First, it asserts that the Committee cannot satisfy § 547(b) of the Bankruptcy Code because the payments sought to be avoided by the Committee were paid to Sharp by Monorail on its independent obligation as a guarantor of the Debtor's debt to Sharp. The money used for the payments came from Monorail's account and went directly to Sharp's bank account, and therefore, Sharp argues, no property of the Debtor was transferred and there was no diminishment of the Debtor's estate. Second, and closely related to the first theory, Sharp contends that Monorail's payments to Sharp are protected under the earmarking doctrine as enunciated by the Eighth Circuit Court of Appeals because there was no transfer of the Debtor's property to Sharp and thus there was no diminution of the Debtor's bankruptcy estate. We examine each of these arguments in turn.

### 1. Were the payments made to Sharp property of the bankruptcy estate?

■ A prerequisite to the recovery of a preferential payment made to a creditor is to demonstrate that an interest of the debtor in property has been transferred to the preferred creditor. Section 547(b) of the Bankruptcy Code provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

---

4. It has been said that the criteria for obtaining summary judgment "are simultaneously obvious and elusive." 11 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.11, p. 56–81 (3rd ed.1999). However, the three cases handed down by the Supreme Court in 1986,

which are cited above, have helped to clarify the standards and criteria for obtaining summary judgment. Nevertheless, application of the rules to a particular case can still be difficult.

(3) made while the debtor was insolvent;

(4) made—

 (A) on or within 90 days before the date of the filing of the petition; or

 (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

 (A) the case were a case under chapter 7 of this title;

 (B) the transfer had not been made; and

 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The phrase "interest of the debtor in property" is not defined in the Bankruptcy Code. The Supreme Court has stated that "property of the debtor" subject to the preferential transfer provision "...is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. Internal Revenue Service,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). *See also, Danning v. Bozek (In re Bullion Reserve of North America),* 836 F.2d 1214, 1217 (9th Cir.1988) ("Generally, property belongs to the debtor for purposes of § 547 if its transfer will deprive the bankruptcy estate of something which could otherwise be used to satisfy the claims of creditors.").

▮▮▮ The provisions of § 547 must be read in conjunction with the provisions of § 541 of the Bankruptcy Code. The terms "property of the debtor" (§ 547) and "property of the estate" (§ 541) are synonymous. *Matter of Criswell,* 102 F.3d 1411, 1416 (5th Cir.1997). Because "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case," § 541(a)(1), "property of the debtor," as used in the definition of a voidable preference in § 547, is for preference purposes equivalent to "property of the estate." *In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1278, n. 8 (8th Cir.1988). The phrase "property of the estate" is interpreted broadly; it extends to property "wherever located and by whomsoever held ... and includes the Debtor's legal, equitable and possessory interests." *In re Continental Airlines, Inc.,* 134 B.R. 536, 541 (Bankr. D.Del.1991).

As previously noted, Sharp argues that the moneys it received by wire transfer from Monorail were not property of the Debtor's bankruptcy estate because they were paid out of Monorail's accounts and funds, and never passed through the Debtor's accounts. The Committee counters that the Debtor had a contractual right to receive payments under the Phelps/Monorail Agreement and that the language of that agreement created an account receivable that is property of the bankruptcy estate. Therefore, the Committee continues, the payments that were wire transferred by Monorail to Sharp consisted of the Debtor's property and, assuming that all other requirements of § 547 are met, were preferential.

The Phelps/Monorail Agreement, in the paragraphs set out above, required Monorail to purchase from the Debtor a substantial amount of computer parts and inventory (the "component inventory") that were in the Debtor's inventory (¶ 1) and specific equipment that was used to manufacture Monorail personal computers (¶ 2). The parties believed that the purchase price for the computer parts and inventory would be $2,200,000.00, but that figure was subject to adjustment on the basis of a physical inventory of the parts being purchased (¶ 1). The price for the equipment to be purchased was $250,000.00 (¶ 2). The agreement further provided (¶¶ 3, 4) that Monorail would receive from the

Debtor 50,000 painted chassis, which would be shipped cash on delivery to Monorail along with the component inventory. Paragraph 4 of the agreement mandated:

At the end of the ten weeks, the entire Component Inventory will be purchased by Monorail, and Phelps will have shipped and Monorail will have received a total of 50,000 painted chassis. Monorail's obligation to purchase Component Inventory is conditional upon Phelps delivery of at least 90% of the chassis in accordance with Section 3 above.

Assuming that the agreement correctly projected the purchase price of the component inventory to be $2,200,000.00, and assuming that the Debtor shipped 10% of the inventory each week as the agreement required, Monorail would be required to pay the Debtor $220,000.00 a week for the component inventory, plus an unspecified amount for the painted chassis that were to be shipped. Additionally, Monorail was to pay the Debtor $50,000.00 a week over the last five weeks of the agreement, for a total of $250,000.00, for the specific equipment that Monorail had agreed to purchase. Therefore, in the first five weeks of the agreement Monorail was to pay the Debtor an average of $220,000.00 a week, and during the last five weeks that amount would increase to $270,000.00 a week, plus any amounts that would be due for the painted chassis being produced by the Debtor.

There is no question in the Court's mind that the Debtor's right to receive payments under the Phelps/Monorail Agreement was a contractual right that vested at the time the parties signed the agreement. *In re Walters*, 172 B.R. 283, 286 (Bankr.W.D.Mo.1994)(citing *In re Simon*, 170 B.R. 999, 1001 (Bankr.S.D.Ill. 1994)). All future payments which the Debtor was entitled to receive under the agreement were, and are, property of the bankruptcy estate. *Id.* Likewise, when the Debtor shipped the component inventory and painted chassis to Monorail, the right to payment arose and, whether character-ized as a contractual right to payment or as an account receivable, the right to payment was, and is, property of the bankruptcy estate. If the component inventory and equipment were property of the Debtor's estate, and there is no contention that they were not, then the proceeds from the sale of the component inventory and equipment were property of the estate, either as accounts receivable or more likely as contractual rights to payment, in view of the provisions of the Phelps/Monorail Agreement. Both contract rights and accounts receivable are widely recognized as property of the bankruptcy estate. *Stingley v. AlliedSignal, Inc. (In re Libby Int'l Inc.)*, 240 B.R. 375, 378 (Bankr.W.D.Mo.1999). The $100,000.00 that was wire transferred to Sharp each week, instead of to the Debtor, was property that would have been property of the Debtor and the Debtor's bankruptcy estate had it not been transferred to Sharp. *Begier, supra.*

Sharp argues that there has been no diminishment of the bankruptcy estate by virtue of Monorail's direct payments to Sharp because the Debtor's debt to Sharp was reduced by a like amount. That argument is fallacious. For one thing, the estate has been diminished because the Debtor did not receive $700,000.00 that it should have received for the component inventory. That is $700,000.00 that the Debtor could have used to pay operating expenses or trade debt, including that of Sharp, in a nonpreferential manner. In addition, the Debtor is now without the component inventory (having a stated value of $2,200,000.00) that was shipped to Monorail. The fact that the Debtor's debt to Sharp has been reduced by $700,000.00 does not change the fact that Sharp, and not the Debtor, received $700,000.00 to which the Debtor was entitled.

Sharp's primary argument, however, seems to be that the payments made to Sharp were not preferential because they were made pursuant to the Guaranty which Monorail had given to Sharp some seven months before the Debtor and

Phelps entered into the Phelps/Monorail Agreement whereby Monorail was to purchase the component inventory and specified equipment from the Debtor for a total of about $2,470,000.00. Sharp relies principally on the payment provision (¶ 5, set out above) of the Phelps/Monorail Agreement, which directed that, "[o]f the weekly payment due to Phelps by Monorail, $100,-000.00 will be paid directly by Monorail to Sharp Electronics Corp..." [5]

Sharp's argument fails for several reasons. First, the Guaranty and the Phelps/Monorail Agreement were completely separate and unrelated agreements. The Guaranty, signed in March 1997 by Monorail, apparently was given to induce Sharp to continue supplying necessary computer parts and supplies to the Debtor and guaranteed payment of the Debtor's debt (up to $1,000,000.00) to Sharp. The Phelps/Monorail Agreement, executed by the parties in October 1997, concerned the purchase of component inventory and equipment from the Debtor at certain prices, and made no mention whatsoever of the Monorail guaranty to Sharp. Secondly, the language from ¶ 5, quoted above, does not indicate in any way that the $100,000.00 to be paid each week to Sharp would be applied to reduce Monorail's exposure on its guaranty (even though the reductions in the Debtor's debt to Sharp would have that effect, at least temporarily). The Guaranty is simply not referred to. Thirdly, the documents con-

tained in the affidavits of the parties do not reflect that the payments were received by Sharp as a reduction of Monorail's guaranty to Sharp; for example, the letter from Sharp's credit manager to Monorail's chief financial officer in January 1998 (prior to the initiation of this litigation) simply stated that the payments received from Monorail "have been applied to the Phelps Technologies, Inc. debt to Sharp Electronics Corp." If it had been intended that the payments were to be applied to reduction of Monorail's guaranty, surely the parties would have so stated. It is inconceivable that Monorail would have made $700,000.00 in payments, believing that it was satisfying its Guaranty to Sharp, and not have obtained written verification of that fact. Fourth, counsel for the parties stipulated in open court that Sharp never made demand on Monorail for payment of the Guaranty, which lends additional support to the conclusion that the payments were not being made pursuant to the Guaranty. [6]

Curiously, Sharp relies on a particular sentence in an August 1997 financial report issued by the Debtor and circulated to creditors to support its argument. In fact, it seems to the Court that the language in the financial report supports the Committee's position. The report states:

"Monorail has recently received orders for an additional 5,000 units from its customers. *Since Phelps does not have*

---

**5.** Sharp is, in effect, trying to claim a secured interest in the flow of payments from Monorail to Phelps. If such a security agreement had been in place, Sharp would indeed have an interest in those payments greater than the general unsecured creditors, and the transfer of the $700,000.00 would not constitute a preference. Such is not the case, however, and neither the Guaranty nor the Phelps/Monorail Agreement can be construed as granting Sharp any interest in the moneys owed to Phelps pursuant to the Phelps/Monorail Agreement greater than those of the general, unsecured creditors.

**6.** The parties disagreed in oral argument whether demand for payment was required by the Guaranty. The opening paragraph, which

was customized to provide for the names of the parties and the amount of the guarantors' liability, expressly states that the guarantors would pay the guaranty "upon demand." The fourth paragraph, which appears to be standard, boilerplate language, states: "Guarantors waive notice of acceptance *of this guaranty* and also presentment, *demand*, protest, notice of protest and notice of dishonor *of any note or other obligation guaranteed hereby.*" (emphasis added) The emphasized wording makes clear that Monorail only waived demand on the Debtor's debt and note to Sharp, because that was the "note or other obligation guaranteed hereby." As far as the Guaranty was concerned, Monorail only waived notice of acceptance.

*sufficient working capital to fund the production of these additional units, Monorail will have to help fund the purchase of the additional components."* (emphasis added)

This financial status report was dated August 29, 1997. On October 9, 1997, less than six weeks later, the Phelps/Monorail Agreement was entered into by the Debtor and Monorail. This makes it painfully obvious that the Phelps/Monorail Agreement was intended to provide Phelps with the financial help it needed to produce computer assemblies for Monorail, not to reduce Monorail's potentially large guaranty obligation to Sharp. Reducing the Debtor's large debt to Sharp (and thereby reducing Monorail's exposure on its guaranty) would do nothing to provide the cash flow the Debtor needed to enable it to increase the production of additional computer assemblies for Monorail.

 It could well be that the Debtor and Monorail intended, but did not clearly state, that a purpose or goal of the October 1997 agreement was to enable Monorail to obtain a reduction in its Guaranty to Sharp. However, what the parties might have intended is immaterial. Because a preference " 'is an infraction of the rule of equal distribution among all creditors,' . . . neither the intent nor motive of the parties is relevant in consideration of an alleged preference under § 547(b)." *Matter of Criswell,* 102 F.3d 1411, 1414 (5th Cir.1997)(*quoting* 4 COLLIER ON BANKRUPTCY ¶ 547.01, at 547–12, 13 (15th ed.1996)). "[I]t is the effect of the transaction, rather than the debtor's or creditor's *intent,* that is controlling." 5 COLLIER ON BANKRUPTCY ¶ 547.01, at 547–14, 15 (15th ed.1999)(emphasis in original). *See also, Corporate Food Management, Inc. v. Suffolk Community College (In re Corporate Food Management, Inc.),* 223 B.R. 635, 641 (Bankr.E.D.N.Y.1998). Therefore, what

the parties might have intended to accomplish in this instance is immaterial; the effect of what was done is controlling.

In oral argument, counsel for Sharp argued that setting aside the payments to Sharp would be unfair because it would result in Monorail's having to pay the $700,000.00 twice. At first blush, that argument has appeal, but it does not withstand scrutiny. In fact, just the opposite is true. If the Court were to rule in Sharp's favor now, Monorail would receive a double benefit for a single payment—it would receive a reduction in its guaranty to Sharp of $700,000.00, and it would be able to retain $700,000.00 worth of inventory and equipment it obtained from the Debtor.[7] Additionally, Sharp would be able to retain the $700,000.00 it received from Monorail, and the general unsecured creditors of the Debtor would be the losers. If Monorail has to pay the $700,-000.00 twice, that is the risk Monorail took. By giving Sharp its guaranty in March 1997, Monorail was taking a risk that the Debtor would not be able to pay its debts to Sharp, and that is exactly what happened. The Phelps/Monorail Agreement entered into in October 1997 was an entirely separate undertaking, pursuant to which Monorail received inventory and equipment in exchange for its $700,000.00 in payments. Monorail is not being required to pay twice for a single benefit.

In summary, the payments made by Monorail, totaling $700,000.00, were property of the Debtor's bankruptcy estate, in that the Debtor had a contractual right to the payments and those payments would have been made to the Debtor to pay for the purchase of the component inventory and equipment, except for the Debtor's direction that the money be sent directly to Sharp. Therefore, Defendant Sharp's Motion for Summary Judgment will be denied on this basis.

---

7. Because Guaranty and the Phelps/Monorail Agreement were entirely separate agreements, Monorail could, theoretically, pursue a third benefit, that is, to seek contribution from the Debtor or other guarantors for the amounts paid to Sharp purportedly pursuant to the Guaranty.

## 2. The earmarking doctrine.

As a second or alternative basis for summary judgment in its favor, Sharp contends that Monorail's payments to Sharp are protected under the earmarking doctrine because there was no transfer of the Debtor's property to Sharp and thus there was no diminution of the Debtor's bankruptcy estate. Because the Court has determined, as discussed above, that there was a transfer of the Debtor's property to Sharp and the Debtor's estate was diminished thereby, an extensive discussion of this theory will not be required.

▬ The earmarking doctrine is a judicially created exception to 11 U.S.C. § 547 that derives from the statutory requirement that a transfer, in order to be found preferential, must be "of an interest of the debtor in property." *Buckley v. Jeld–Wen, Inc. (In re Interior Wood Products Co.)*, 986 F.2d 228, 231 (8th Cir.1993); *Lewis v. Providian Bancorp (In re Getman)*, 218 B.R. 490, 492 (Bankr.W.D.Mo. 1998). In addition to the five elements under § 547 (§ 547(b)(1)-(5)), the Committee, standing in the shoes of the trustee, has the burden of proving that the earmarking doctrine does not apply, *In re Ward*, 230 B.R. 115, 119 (8th Cir. BAP 1999), and that the debtor *did* have an interest in the property transferred. *Stingley v. AlliedSignal, Inc. (In re Libby International, Inc.)*, 240 B.R. 375, 377 (Bankr.W.D.Mo.1999).

▬ As the parties have pointed out in their Suggestions, there are three parties required in an earmarking situation: an "old creditor" (the pre-existing creditor who receives payment within the 90–day preference period), a "new creditor" or "new lender" (who supplies the funds to pay off the "old creditor"), and the debtor. *McCuskey v. National Bank of Waterloo (In re Bohlen Enter., Ltd.)*, 859 F.2d 561, 565 (8th Cir.1988)(hereinafter *Bohlen*). In *Bohlen*, the Eighth Circuit set out the three requirements that must be met for the earmarking doctrine to apply: (1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt; (2) performance of that agreement according to its terms; and (3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate. *Id.* at 566.

▬ In *Kaler v. Community First Nat'l Bank (In re Heitkamp)*, 137 F.3d 1087 (8th Cir.1998)(hereinafter *Heitkamp*), the Eighth Circuit further refined the earmarking doctrine and adopted what has been referred to as a "net result rule." *Ward*, 230 B.R. at 119–20. Under *Heitkamp*, the focus is not so much on the identity and relationship of the party supplying the new funds as it is on the net effect or result of the transfers. "*Heitkamp* represents a major change in the application of the doctrine in this circuit. Prior to *Heitkamp*, the doctrine was considered in cases which focused on whether a transfer to an old or previous creditor was preferential.... After *Heitkamp*, preference attacks on transfers to new creditors in earmarking situations must be analyzed in terms of this net result rule to determine if there has been a transfer of property of the debtor." *Id.*

▬ Applying these rules and guidelines to the present case, the Court is persuaded that the earmarking doctrine does not apply and that the Committee has met its burden in that regard. Initially, the doctrine does not apply here because there is no "new lender." In its Suggestions, Sharp argues vigorously that the earmarking doctrine applies because there has been a "mere substitution" of one creditor (Monorail) for another creditor (Sharp). But that is not what occurred in this instance. Monorail did not advance any new credit to the Debtor; it purchased components inventory and equipment from the Debtor and, at the Debtor's direction, paid a portion of the purchase price directly to Sharp for the purpose of reducing the

Debtor's outstanding debt to Sharp. By paying $700,000.00 directly to Sharp for the purpose of reducing the Debtor's debt to Sharp, Monorail did not thereby become a creditor of the Debtor for that same $700,000.00; if that were the case, the Debtor would be paying the $700,000.00 twice. Instead, by in effect requiring (pursuant to the Phelps/Monorail Agreement) that the Debtor pay a portion ($100,000.00 of each week's payment) of the purchase price to Sharp to reduce debt, Monorail was simply assuring that its potential exposure to Sharp on its Guaranty was reduced by that same $700,000.00 (assuming that Sharp did not permit the Debtor to incur new debt and increase the potential exposure again on the Guaranty). This transaction did not make Monorail a "new creditor" in any way, so there could be no substitution of one creditor for another. Instead of *increasing* the Debtor's potential debt under the Guaranty to Monorail, these payments actually *reduced* that potential debt by reducing the debt to Sharp.

Secondly, and much more importantly, bearing in mind the "net result rule" of *Heitkamp,* the net result of the transaction was to diminish the Debtor's estate by $700,000.00, as the Court has already noted. Monorail purchased more than $700,-000.00 in inventory and equipment from the Debtor pursuant to the Phelps/Monorail Agreement, but instead of paying the Debtor $700,000.00 on the purchase price Monorail wire transferred that amount directly to Sharp, an unsecured creditor of the Debtor. As the Court has emphasized above, the Debtor had a contractual right to receive the payments that were diverted to Sharp, and therefore the payments became property of the Debtor's bankruptcy estate. Since the Debtor did not receive the $700,000.00, its estate has been diminished by that amount. If the Debtor had transferred $700,000.00 worth of inventory and equipment to Sharp in exchange for a reduction of its debt to Sharp, within 90 days of the bankruptcy filing, there surely would be no argument that that was a preferential transfer, avoidable under

§ 547(b). In this case, a more circuitous route has been taken, in that the inventory and equipment were transferred to Monorail and Monorail paid money to Sharp instead of the Debtor, but the result is the same. The Debtor has parted with $700,-000.00 worth of assets and has obtained a corresponding reduction in its debt to Sharp, an unsecured creditor, within 90 days of the bankruptcy filing. The fact that Monorail obtained an additional benefit from the transaction, namely the momentary reduction of its guaranty exposure to Sharp, does not change the net result.

For the foregoing reasons, the Court finds that the Committee has met its burden in showing that the earmarking doctrine does not apply in this case, and Sharp is not entitled to summary judgment pursuant to the earmarking doctrine.

### C. The Committee's Motion for Summary Judgment.

Having countered Sharp's Motion for Summary Judgment, the Committee asks the Court to enter summary judgment in the Committee's favor on its preference claim against Sharp. As the Court's discussion on Sharp's Motion would indicate, the Court is persuaded that a preferential transfer of the Debtor's property has occurred and that the Committee is entitled to summary judgment.

 The elements of an avoidable preferential transfer have been set out above and need not be repeated here. The evidence now before the Court demonstrates that there is no genuine issue of material fact with respect to the following requirements of § 547(b):

(1) There was a transfer of $700,000.00 to Sharp Electronics, for the benefit of Sharp (Exs. 3 and 4, Committee's Motion).

(2) The payment of $700,000.00 was made to Sharp on account of an antecedent debt owed by the Debtor before the transfer was made (Ex. 3, Committee's Motion).

(3) The Debtor was presumptively insolvent, in that the payments were made within 90 days of the filing of the bankruptcy petition. § 547(f).

(4) The payments were made within 90 days of the filing of the petition (Exs. 3 and 4, Committee's Motion).

(5) The payments enabled Sharp to receive more than it would have received if this case were a case under Chapter 7 of the Bankruptcy Code (Ex. 8, Committee's Motion).

In *National Bank of Newport v. National Herkimer County Bank*, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912), the Supreme Court analyzed a preference in language that is particularly appropriate in this case. It said:

> To constitute a preference, it is not necessary that the transfer be made directly to the creditor. It may be made to another, for his benefit. If the bankrupt has made a transfer of his property, the effect of which is to enable one of his creditors to obtain a greater percentage of his debt than another creditor of the same class, circuity of arrangement will not avail to save it. A "transfer" includes "the sale and every other and different mode of disposing of or parting with property, or the possession of property, absolutely or conditionally, as a payment, pledge, mortgage, gift, or security." Sec. 1(25) [30 Stat. at L. 545, chap. 541, U.S. Comp. Stat.1901, p. 3420]. It is not the mere form or method of the transaction that the act condemns, but the appropriation by the insolvent debtor of a portion of his property to the payment of a creditor's claim, so that thereby the estate is depleted and the creditor obtains an advantage over other creditors. The "accounts receivable" of the debtor, that is, the amounts owing to him on open account, are, of course, as susceptible of preferential disposition as other property; and *if an insolvent debtor arranges to pay a favored creditor through the disposition of such an account, to the depletion of his estate, it must be regarded as equally a preference, whether he procures the payment to be made on his behalf by the debtor in the account...or he collects the amount and pays it over to his creditor directly.*

*Id.,* 225 U.S. at 184, 32 S.Ct. at 635 (emphasis added).

What we have in the present case is a "circuity of arrangement" as referred to by the Supreme Court. Rather than making a payment directly to Sharp on its antecedent debt, the Debtor entered into an agreement with Monorail for the transfer of certain inventory and equipment to Monorail partially in exchange for Monorail's payments to Sharp. Though the payments were not made directly by the Debtor to Sharp, the payments were nevertheless made for the Debtor's benefit by Monorail and at the Debtor's direction. The payments were made utilizing property of the Debtor and were therefore preferential.

One final matter must be attended to. In its Reply and Opposition to the Committee's Motion for Summary Judgment, Sharp asserted for the first time (and then only in a footnote) that it was reserving its right to challenge the Committee's standing to bring this adversary proceeding. Counsel for the Committee objected to the Court's consideration of this issue. The Court concurs with the Committee that the issue of the Committee's standing to bring this action is not properly before the Court. Sharp has not raised this issue previously in an appropriate or timely manner, either in its Answer to the Committee's Complaint or by separate Motion. Therefore, any objection by Sharp to the Committee's standing to bring this action will be overruled.

Based on the foregoing, it is

**ORDERED** that the Motion for Summary Judgment filed herein by Defendant Sharp Electronics Corp., be and is hereby DENIED. It is

**FURTHER ORDERED** that the Motion for Summary Judgment filed herein by Plaintiff, The Committee of Unsecured Creditors, be and is hereby GRANTED. Judgment is entered in favor of Plaintiff, for the benefit of the Debtor, and against Defendant Sharp Electronics Corp., in the sum of $700,000.00, plus interest at the rate established by Mo.Rev.Stat. § 408.020 from the dates of the various transfers and from and after judgment, plus the costs of this action.

**SO ORDERED.**